******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* JORDAN HINTON
## (SC 20881)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Dannehy and Bright, Js.

*Syllabus*

Convicted of the crime of felony murder and attempt to commit robbery in the first degree, among other crimes, the defendant appealed to this court. The defendant's conviction stemmed from an incident in which another individual, C, shot the murder victim, D, while D and the defendant were engaged in a scuffle that occurred after the defendant had attempted to rob R. On appeal, the defendant claimed, inter alia, that the state, in order to secure the defendant's conviction of felony murder, was required to demonstrate that C had been an accessory to the defendant's predicate crime of attempted robbery. *Held*:

The defendant could not prevail on his claim that the felony murder statute (§ 53a-54c) required the state to establish that C was an accessory to the defendant's attempted robbery of R, as felony murder is substantively distinct from other forms of vicarious criminal liability, such as accessorial liability, and the plain language of § 53a-54c does not require the state to establish accessorial liability.

The state presented sufficient evidence to sustain the defendant's conviction of felony murder, as the jury reasonably could have found, based on the evidence presented, that C had actively participated in the defendant's attempt to rob R and that C had shot and killed D in the course of and in furtherance of the predicate crime of attempt to commit robbery.

This court having concluded that the state was not required to establish that C was an accessory to the defendant's attempted robbery of R as a prerequisite to the defendant's conviction of felony murder, the defendant could not prevail on his claim that the trial court had improperly failed to instruct the jury that the state had the burden of establishing that C was an accessory.

The defendant could not prevail on his unpreserved claim that the trial court had violated his right of confrontation by admitting certain video-recorded interviews of R that had been conducted by the police, as defense counsel affirmatively waived this claim by stating to the trial court that he did not object to the admission of the video-recorded interviews and by expressly agreeing that those interviews were admissible under *State* v. *Whelan* (200 Conn. 743).

This court declined the defendant's request to overrule or modify its holding in *State* v. *Newsome* (238 Conn. 588) that a reliable out-of-court statement

may serve as the sole evidentiary basis for a conviction but that evidentiary sufficiency under such circumstances must be determined on a case-by-case basis.

Having declined to overrule of modify *Newsome*, this court applied the holding of that case in rejecting the defendant's claim that the video-recorded interviews of R, in the absence of other corroborative evidence, were insufficient to establish the defendant's intent to commit attempted robbery.

This court concluded that R's statements to the police during the video-recorded interviews were reliable for purposes of *Newsome*, and, in any event, those statements did not constitute the only evidence on which the jury could have relied in finding that the defendant had the specific intent to commit attempted robbery.

Argued March 10—officially released June 24, 2025

*Procedural History*

Substitute information charging the defendant with the crimes of murder, felony murder, attempt to commit robbery in the first degree, criminal possession of a pistol and carrying a pistol without a permit, brought to the Superior Court in the judicial district of Fairfield, where the charges of felony murder, murder, attempt to commit robbery in the first degree and carrying a pistol without a permit were bifurcated and tried to the jury before *E. Richards, J.*; verdict of guilty of the lesser included offense of manslaughter in the first degree with a firearm, felony murder, attempt to commit robbery in the first degree and carrying a pistol without a permit; thereafter, the charge of criminal possession of a pistol was tried to the jury before *E. Richards, J.*; verdict of guilty; subsequently, the court vacated the verdict of guilty of manslaughter in the first degree with a firearm and rendered judgment of guilty of felony murder, attempt to commit robbery in the first degree, criminal possession of a pistol and carrying a pistol without a permit, from which the defendant appealed to this court. *Affirmed.*

*Dina S. Fisher*, assigned counsel, for the appellant (defendant).

*Rocco A. Chiarenza*, senior assistant state's attorney, with whom, on the brief, were *Joseph T. Corradino*, state's attorney, and *Michael A. DeJoseph*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

D'AURIA, J. The defendant, Jordan Hinton, appeals directly to this court from the judgment of conviction, rendered after jury trials, of felony murder in violation of General Statutes § 53a-54c, attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 and 53a-134 (a) (4), criminal possession of a pistol in violation of General Statutes (Rev. to 2017) § 53a-217c (a) (1) and carrying a pistol without a permit in violation of General Statutes (Rev. to 2017) § 29-35 (a). The defendant claims that (1) there was insufficient evidence to convict him of felony murder because there was no evidence that the shooter, Mark Christian, was the defendant's accessory to the predicate crime of attempted robbery, (2) the trial court's felony murder instruction incorrectly failed to inform the jury that the state had the burden to establish that Christian was the defendant's accessory to the predicate crime of attempted robbery, (3) the court violated the defendant's constitutional right to confrontation by improperly admitting into evidence Omar Rivera's video-recorded interviews with the police because Rivera's inability to recall the shooting during his testimony at trial rendered him functionally unavailable for cross-examination, and (4) Rivera's video-recorded interviews were insufficient in the absence of additional corroborative evidence to establish his specific intent to commit attempted robbery. We affirm the trial court's judgment.

The jury reasonably could have found the following facts. On October 14, 2017, Deon "Bishop" Rodney was shot and killed while protecting customers from the defendant and Christian at his barbershop in Bridge-

port. Rivera would often socialize with the barbers at the shop, called Just Right Cutz, including Rodney and his friend, Manny. Several months before the shooting, Rivera overheard the defendant calling Manny a "snitch." Rivera asked a third party why the defendant was "talkin[g] about my boy like that . . . ." The defendant eventually learned of Rivera's inquiry about his remark regarding Manny.

On October 14, 2017, Rivera, Manny, and Rodney were socializing at the barbershop. As Rivera left to pick up a pizza, the defendant approached Rivera on the sidewalk and asked, "what was that shit you said about me?" Rivera instantly recognized the defendant, although it had been several months since they had interacted. The defendant was wearing all black clothing, a mask that covered his nose and mouth, a hood over his head, and glasses. Rivera asked the defendant what he meant, and the defendant responded, "nice chain," and attempted to snatch it from Rivera's neck, breaking the chain and ripping his shirt. The defendant and Rivera began a physical altercation, during which the defendant displayed a gun. Rivera retreated back into the barbershop, where he told Manny and others how the defendant had attempted to rob him while showing them his broken chain and ripped shirt.

At the same time, the defendant went into Sammy's Dollar, a store next to the barbershop. Although Christian was not present for the initial interaction between the defendant and Rivera, he approached the defendant inside Sammy's Dollar. Video evidence captured the defendant reenacting for Christian how he had grabbed Rivera's chain and how he had showed Rivera his gun. The defendant and Christian left the store together and began walking around the parking lot outside of the barbershop. Christian removed a gun from his jacket, ensured that a cartridge from the magazine was in the chamber, and put it back into his jacket. As Christian

went to open his car door, the defendant approached Christian and said something that prompted Christian to close the door and reach once again into his jacket pocket, where he kept his loaded gun. After the defendant and Christian got into a brief physical altercation with some unknown individuals outside of the barbershop, Christian returned to stand next to his car, again readjusted his gun in his jacket pocket, and signaled to a passenger, who moved into the driver's seat. Christian handed the occupant his car keys, and both Christian and the defendant approached the front of the barbershop.

Rivera, Manny, and a crowd of others then walked outside the barbershop, where Rivera pointed to and identified the defendant as the person who had tried to steal his chain. The defendant started walking toward Rivera, pointed a gun at him and said he would "take everything else." As Rivera and the crowd fled back into the barbershop, the defendant and Christian ran after him, each holding his own gun. Most of the crowd, including Rivera, took cover in the back of the barbershop, but Rodney stood at the doorway and punched the defendant as he entered with his gun. Rodney fought the defendant at the doorway, forcing him onto the sidewalk outside the barbershop, where they continued to scuffle on the ground. While Rodney and the defendant fought on the sidewalk, Christian approached and shot Rodney. The defendant and Christian fled the scene. Rodney died as a result of his injuries.

The police obtained a series of surveillance videos from the barbershop, Sammy's Dollar, and neighboring businesses that captured most of the events that evening, aside from the initial encounter between Rivera and the defendant. Within days of the killing, police officers conducted two audio and video-recorded interviews with Rivera, who relayed his version of the events. Rivera appeared alone for the first interview but with

counsel for the second interview. Rivera's factual accounts in both interviews were substantially the same and corresponded with the surveillance videos. During the first interview, Rivera verbally identified the defendant from a photograph provided by the police as the person who tried to rob him, but he refused to sign and date the photograph because he did not want to "[tell] on the dude." During the second interview, with his counsel present, Rivera positively identified the defendant with 100 percent certainty from lineup photographs and screenshots from the surveillance video, and he signed and dated the photographs. One year later, the state located and arrested the defendant in New York.

The state charged the defendant with murder as an accessory in violation of General Statutes §§ 53a-8 (a) and 53a-54a (a), felony murder in violation of § 53a-54c, attempt to commit robbery in the first degree in violation of §§ 53a-49 and 53a-134 (a) (4), criminal possession of a pistol or revolver in violation of General Statutes (Rev. to 2017) § 53a-217c (a) (1), and carrying a pistol or revolver without a permit in violation of General Statutes (Rev. to 2017) § 29-35 (a). Rivera was subpoenaed to testify at the defendant's jury trial, but he claimed not to recall the events leading up to the shooting or his interviews with the police. Defense counsel did not object to the state's introduction into evidence of Rivera's two video-recorded interviews with the police, the photographs Rivera had signed to identify the defendant, or the surveillance videos.

The jury found the defendant not guilty of murder as an accessory, and guilty of the lesser included offense of intentional manslaughter as an accessory, felony murder, attempt to commit robbery in the first degree, as well as the remaining firearm counts, as charged. The trial court rendered judgment in accordance with the jury's verdict but later vacated the manslaughter conviction on double jeopardy grounds. The court sen-

tenced the defendant to a total effective term of forty years of imprisonment. The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).[1]

## I

The defendant first claims that there was insufficient evidence to convict him of felony murder because there was no evidence that the shooter, Christian, was the defendant's accessory to the predicate crime of attempted robbery of Rivera. He contends that the felony murder statute, § 53a-54c, required the state to establish that Christian was the defendant's accessory in accordance with the accessorial liability statute, § 53a-8, and "had the same specific intent as the defendant in committing" attempted robbery. He further argues that there was insufficient evidence to establish that Rodney's death occurred "in the course of" and "in furtherance of" the attempted robbery. We reject the defendant's arguments.

## A

We first address the defendant's claim that § 53a-54c required the state to establish that Christian was the defendant's accessory in the attempted robbery of Rivera.

Our felony murder statute provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, such person . . . attempts to commit robbery . . . and, in the course of and in furtherance of such crime or of flight therefrom, such person, or another participant, if any, causes the death of a person other than one of the participants . . . ."

---

[1] The defendant does not contest the jury's verdict of guilty with respect to the charge of intentional manslaughter, and his counsel stated during oral argument before this court that the manslaughter count should be reinstated only if the felony murder conviction is vacated. The defendant also does not challenge his conviction of the firearm offenses.

General Statutes § 53a-54c. "The felony murder statute reflects a legislative determination that certain crimes, such as robbery, create a foreseeable risk of death to a victim of, or bystander to, the crime and, accordingly, imposes criminal liability not only on the person who caused the death, but also on any other participant to the underlying felony. . . . [A] defendant may be convicted of felony murder even if neither he nor his confederates had any intent to kill . . . ." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Bennett*, 307 Conn. 758, 764, 59 A.3d 221 (2013).

We have recognized that felony murder is a substantively distinct theory of vicarious criminal liability compared to other doctrines, such as *Pinkerton*[2] liability and accessorial liability under § 53a-8. See id. The felony murder statute, § 53a-54c, imposes criminal liability for any participant in a set of dangerous crimes that create a foreseeable risk of death to a victim or bystander. Id., 765. On the other hand, "[t]o be guilty as an accessory one must *share* the criminal intent and community of unlawful purpose with the perpetrator of the crime and one must knowingly and wilfully assist the perpetrator in the acts which prepare for, facilitate or consummate it. . . . [Section] 53a-8 requires the defendant to have the specific mental state required for the commission of the substantive crime. . . . [A]ccessorial liability is not a distinct crime, but only an alternative means by which a substantive crime may be committed . . . . Consequently, to establish a person's culpability as an accessory to a particular offense, the state must prove that the accessory, like the principal, had committed each and every element of the offense." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id.

---

[2] See *Pinkerton* v. *United States*, 328 U.S. 640, 647–48, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946).

We have consistently interpreted § 53a-54c to impose only the requirements written into that statute. "In order to sustain the conviction of felony murder, the record must reflect that the state proved beyond a reasonable doubt that the victim's death was caused in the course of and in furtherance of the predicate felony, in this case, attempted robbery." *State* v. *Andrews*, 313 Conn. 266, 314, 96 A.3d 1199 (2014); see also *State* v. *Cobbs*, 203 Conn. 4, 6, 522 A.2d 1229 (1987); *Moon* v. *Commissioner of Correction*, 227 Conn. App. 838, 882, 322 A.3d 427, cert. granted, 350 Conn. 918, 325 A.3d 216 (2024). Instead of requiring that the state prove that a participant who caused the death was the defendant's accessory, the legislature has limited criminal responsibility for felony murder in two respects. "The requirement that the death occur in the course of the underlying felony imposes a temporal limitation on felony murder . . . whereas the requirement that the death occur in furtherance of the underlying felony imposes a causal limitation." (Citation omitted; internal quotation marks omitted.) *State* v. *Andrews*, supra, 314.

Contrary to the defendant's argument, the plain language of § 53a-54c does not require the state to establish that a participant who causes the death was the defendant's accessory to obtain a conviction of felony murder, and we decline to import that requirement into the statute. See *State* v. *Wilchinski*, 242 Conn. 211, 232–33, 700 A.2d 1 (1997) (declining to graft requirements of § 53a-8 onto legislation not evident in General Statutes § 53a-217a as written). Had the legislature intended for the state to establish *both* the defendant's and the participant's mental state for the predicate crime, it could have expressly done so. See, e.g., *State* v. *Christopher S.*, 338 Conn. 255, 270–71, 257 A.3d 912 (2021) (courts defer to legislature's specific choice of language). Or the legislature could have easily incorporated a reference to the accessorial liability statute, § 53a-8, as it has done

in other statutes. See, e.g., *State* v. *Brown*, 331 Conn. 258, 279, 202 A.3d 1003 (2019) (legislature "easily" could have included statutory reference); see also General Statutes § 53a-46a (h) (incorporating reference to § 53a-8); General Statutes § 53a-223 (b) (same). Indeed, we have held that § 53a-54c contains no mental state requirement beyond that of the defendant's intent to commit the underlying felony on which the felony murder charge is predicated. See, e.g., *State* v. *Valeriano*, 191 Conn. 659, 662, 468 A.2d 936 (1983), cert. denied, 466 U.S. 974, 104 S. Ct. 2351, 80 L. Ed. 2d 824 (1984); see also *State* v. *Kyles*, 221 Conn. 643, 668, 607 A.2d 355 (1992); *State* v. *Castro*, 196 Conn. 421, 428–29, 493 A.2d 223 (1985). In short, "[i]f the legislature had intended to place further limitations on . . . felony murder, it would have so stated in the statute." *State* v. *Kyles*, supra, 668.

The defendant directs us to a series of this court's decisions from the 1980s in which we employed language equating "participant," as used in § 53a-54c, with "accessory." See *State* v. *Simms*, 201 Conn. 395, 418, 518 A.2d 35 (1986); *State* v. *Young*, 191 Conn. 636, 643, 469 A.2d 1189 (1983); *State* v. *Valeriano*, supra, 191 Conn. 661–63. These decisions do not control the legal meaning of a "participant," as used in § 53a-54c, because the definition of that term was not at issue in those cases. Instead, we used the word "accessory," and other synonyms like "accomplice" and "confederates," on our way to holding that the phrase "in furtherance of" required a causal relationship between the predicate felony and the homicidal act committed by someone other than the defendant. See *State* v. *Simms*, supra, 418; see also *State* v. *Young*, supra, 643 ("[i]n addition to its function in defining the scope of accomplice liability, the 'in furtherance' phrase also may serve, where only a single actor is involved, to exclude those murders which, while committed during the course of an under-

lying felony, are wholly unrelated to the commission of that crime"). Specifically, we held in *Young* that the phrase "in furtherance of" narrowed the scope of a defendant's vicarious liability for the homicidal acts of his accomplice/confederate/accessory "to those circumstances which were within the contemplation of the confederates to the undertaking, just as the liability of a principal for the acts of his servant is similarly confined to the scope of the agency." *State* v. *Young*, supra, 642. Although we compared the type of vicarious liability for felony murder and accessorial liability, we have never held that the state is required to meet the elements of the accessorial liability statute for the predicate felony to obtain a felony murder conviction. See, e.g., id.; see also *State* v. *Simms*, supra, 418 (charge requiring state to prove accessorial intent did not expand felony murder liability); *State* v. *Valeriano*, supra, 661–63 (felony murder requires no proof of intent to kill). Therefore, we disagree with the defendant that § 53a-54c required the state to establish that Christian was the defendant's accessory in the predicate crime of attempted robbery.[3]

B

We next consider whether the state presented sufficient evidence to demonstrate that Christian, as a participant, killed Rodney in the course of and in the furtherance of the defendant's attempted robbery.

---

[3] Because we agree with the state's argument that § 53a-54c does not require it to establish that Christian was the defendant's accessory to the attempted robbery, we do not address the state's additional contention that there was sufficient evidence to establish Christian's specific intent to commit attempted robbery. We likewise do not address the state's alternative argument that the defendant's actions alone were sufficient to establish that Rodney was killed in the course of and in the furtherance of the attempted robbery. See, e.g., *State* v. *Flanders*, 214 Conn. 493, 505, 572 A.2d 983 (defendant could be found guilty of felony murder if state proved defendant *or* participant caused victim's death), cert. denied, 498 U.S. 901, 111 S. Ct. 260, 112 L. Ed. 2d 217 (1990).

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether [on] the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Ziolkowski*, 351 Conn. 143, 160, 329 A.3d 939 (2025). "In doing so, we are mindful that the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier [of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . [W]e must focus on the evidence presented, not the evidence that the state failed to present . . . . [W]e do not draw a distinction between direct and circumstantial evidence so far as probative force is concerned . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Honsch*, 349 Conn. 783, 811, 322 A.3d 1019 (2024).

"The requirement that the death occur in the course of the underlying felony imposes a temporal limitation on felony murder." (Internal quotation marks omitted.) *State* v. *Andrews*, supra, 313 Conn. 314. "[I]f the use of force occurs during the continuous sequence of events surrounding the taking or attempted taking, even though some time immediately before or after, it is considered to be in the course of the robbery or the attempted robbery within the meaning of the statute" defining felony murder, namely, § 53a-54c. (Internal quotation marks omitted.) *State* v. *Gomez*, 225 Conn. 347, 352, 622 A.2d 1014 (1993). "[T]he phrase 'in furtherance of' was intended to impose the requirement of a relationship between the underlying felony and the homicide beyond that of mere causation in fact, similar to the concept of

proximate cause in the law of torts." *State* v. *Young*, supra, 191 Conn. 642. The phrase "in furtherance of" requires "a logical nexus between the felony and the homicide. . . . More than the mere coincidence to time and place . . . the nexus must be one of logic or plan. Excluded are those deaths which are so far outside the ambit of the plan of the felony and its execution as to be unrelated to them." (Citation omitted; internal quotation marks omitted.) Id., 641.

Sufficient evidence, along with the jury's reasonable inferences from that evidence, existed for a rational fact finder to conclude that Christian was a participant[4] in the defendant's attempted robbery of Rivera. The jury saw a video of the defendant's reenacting to Christian his attempt to snatch Rivera's chain at Sammy's Dollar, after which the defendant and Christian left together, and Christian confirmed that his gun was locked and loaded. The defendant then dissuaded Christian from getting into his car, and Christian again reached into his jacket pocket to ensure that his gun was locked and loaded. Christian prepared his getaway car, and he and the defendant together approached Rivera outside the barbershop. The jury could have reasonably inferred that these conversations prompted Christian to ensure that his gun was prepared for use against Rivera and that his preparation for a quick escape meant that he was about to engage Rivera with his gun. Furthermore, when the defendant pursued Rivera back into the barbershop to "take everything else," Christian was there ready with his own gun drawn, which he used to kill Rodney when he and the defendant tussled their way back out of the barbershop

---

[4] We leave for another day the precise parameters of what constitutes a "participant" as used in § 53a-54c, except to say that it is a standard different from that of our "accessory" statute. See part I A of this opinion. To aid our analysis in the present appeal, we use the defendant's proffered meaning of the term "participant" in common parlance to be " 'any person who takes part in any activity . . . .' "

and onto the sidewalk. The jury could have inferred from this evidence that Christian directly supported the defendant's attempt to rob Rivera by being present with his gun when the defendant ran after Rivera into the barbershop and by using the gun to kill Rodney, who had thwarted the defendant's pursuit of Rivera. Viewing this evidence in the light most favorable to sustaining the verdict, the jury could have reasonably found that Christian actively participated in the defendant's attempted robbery of Rivera.

The state also presented ample evidence to establish that Christian killed Rodney "in the course of" the attempted robbery. The jury reasonably could have concluded from the evidence that Rodney's death occurred during the sequence of events surrounding the attempted robbery because Christian shot Rodney while he resisted the defendant's attempt to rob Rivera as Rivera fled into the barbershop. See, e.g., *State* v. *Ghere*, 201 Conn. 289, 297–98, 513 A.2d 1226 (1986) (killing occurred "in the course of" attempted robbery because it happened within seconds of demand for money); see also id., 292. The sequence of events spanning from the initial attempt to snatch Rivera's chain to Christian's shooting of Rodney was in temporal proximity. See, e.g., *State* v. *Andrews*, supra, 313 Conn. 315 (killing occurred "in the course of" attempted robbery because it resulted in "continuous, uninterrupted sequence over a short period of time, there being no apparent break between" victim's death and defendant's demand for drugs or money). But cf. *State* v. *Turner*, 340 Conn. 447, 459–61, 264 A.3d 551 (2021) (killing was not " 'in the course of' " robbery because robbery was completed previous day, and there was no evidence that use of force was connected to robbery).

Finally, the jury also could have reasonably concluded that Christian killed Rodney "in furtherance of" the attempted robbery because Christian shot Rodney

as he resisted the defendant's pursuit of Rivera back into the barbershop to rob him. Under these circumstances, there was a logical nexus between Christian's shooting of Rodney and the defendant's attempted robbery of Rivera. See, e.g., *State* v. *Andrews*, supra, 313 Conn. 316 (killing was "in furtherance of" attempted robbery by several attackers because it was "initiated and perpetuated by the victim's refusal to surrender the crack cocaine and by her attackers' determination to obtain it"); *State* v. *Amado*, 254 Conn. 184, 201, 756 A.2d 274 (2000) (killing was "in furtherance of" attempted robbery because victims were shot when they denied having defendant's cocaine); *State* v. *LaFountain*, 127 Conn. App. 819, 834, 16 A.3d 761 (killing was " 'in furtherance of' " attempted robbery because it was "well under way" after victims slammed door and defendant fired gunshots into kitchen), cert. denied, 301 Conn. 921, 22 A.3d 1281 (2011); *State* v. *Thomas*, 62 Conn. App. 356, 358–59, 363, 772 A.2d 611 (killing was "in furtherance of" attempted robbery because victim resisted defendant's request to surrender possessions), cert. denied, 256 Conn. 912, 772 A.2d 1125 (2001). Rodney's death and the defendant's attempted robbery of Rivera were far more than a coincidence of time and place. See *State* v. *Young*, supra, 191 Conn. 641. Indeed, defense counsel acknowledged at oral argument before this court that either Christian or the defendant proximately caused Rodney's death. In sum, we conclude that there was sufficient evidence to demonstrate that Rodney was killed in the course of and in furtherance of the defendant's attempted robbery.

## II

The defendant next claims that the trial court's felony murder instruction incorrectly failed to inform the jury that the state had the burden to establish that Christian was the defendant's accessory to the predicate crime of attempted robbery. The defendant concedes that "[t]he

court correctly recited the [felony murder] statute" but contends that the court's instructions failed to "explain that the state had to prove that . . . Christian was an accomplice of the defendant in a robbery attempt. Since robbery is a specific intent crime, this means that the state had to prove . . . Christian's intent." The state responds that the defendant's claim was waived, inadequately briefed, and meritless. Assuming, without deciding, that the defendant did not waive this claim at trial and that it is adequately briefed on appeal, we conclude that the charge was sufficiently correct in law and fairly presented the case to the jury. See, e.g., *State* v. *Campbell*, 328 Conn. 444, 528, 180 A.3d 882 (2018).

Tracking the language of § 53a-54c, the court instructed the jury that "[a] person is guilty of felony murder when acting either alone or with one or more persons, he commits or attempts to commit a robbery, and in the course of and in the furtherance of such crime, or of flight therefrom, *he or another participant, if any, causes the death of a person* other than one of the participants." (Emphasis added.) The court further instructed the jury that the "[t]he second element [of felony murder] is that the actions of the defendant or another participant in the crime of attempted robbery in the first degree *were the proximate cause* of the death of . . . Rodney. You must find proved beyond a reasonable doubt that . . . *Rodney died as a result of the defendant's or another participant's actions.*" (Emphasis added.) The court summarized the state's burden of proof by instructing the jury that "the state must prove beyond a reasonable doubt [that] the defendant, acting alone or with one or more persons . . . committed an attempted robbery in the first degree, the defendant or another participant in the attempted robbery in the first degree caused the death of . . . Rodney . . . while in the course of and in furtherance of the commission of the attempted robbery [in the]

first degree, or in the immediate flight from the crime . . . ."

In part I A of this opinion, we concluded that § 53a-54c did not require the state to establish that Christian was the defendant's accessory in accordance with § 53a-8. For the reasons we stated in part I A of this opinion, it was also legally proper for the court not to instruct the jury that the state was required to establish that Christian was the defendant's accessory. We therefore reject the defendant's instructional error claim.

## III

The defendant next claims that the trial court violated his confrontation rights by improperly admitting into evidence Rivera's two video-recorded interviews with the police under *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). The defendant argues that Rivera was not available for cross-examination because, although he testified at trial, his lack of recollection rendered him "functionally unavailable . . . ." See, e.g., *State* v. *Pierre*, 277 Conn. 42, 80, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006); see also *Crawford* v. *Washington*, 541 U.S. 36, 40, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); *State* v. *Whelan*, supra, 753. It is undisputed that the defendant failed to preserve this claim at trial; thus, he seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[5] The state

---

[5] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see also *In re Yasiel R.*, supra, 317 Conn. 781 (modifying third prong of *Golding*).

maintains that *Golding* is not satisfied because defense counsel affirmatively waived this claim by stating to the court that he did not object to the admission of Rivera's interviews and agreeing to their admissibility. We agree with the state.

During the second day of evidence, the trial court, defense counsel, the prosecutor, and Rivera's counsel met in chambers to discuss Rivera's prospective testimony. Rivera then answered under oath a series of the court's questions outside the presence of the jury. Rivera testified as to his age and education, and that his ability to testify was not impacted by drugs or alcohol, although he said that he had not slept for twenty-four hours. Rivera testified that he had no recollection of speaking with the police in October, 2017, or of his two video-recorded interviews. Rivera said that he is an alcoholic and drinks every day, so he does not remember what happened yesterday, and he confirmed that no one had compelled him to say that.

The prosecutor then questioned Rivera in the presence of the jury. He testified that his presence was compelled by a subpoena, and he was informed by his lawyer that his failure to comply could result in contempt and jail time. He claimed to have no recollection of Just Right Cutz, the surrounding businesses, the incident leading to Rodney's death, or of speaking with the police about it afterward. Rivera said he could not remember either if anyone had approached him regarding his testimony or whether he had told the prosecutor earlier that morning that he feared being labeled a snitch. He stated, however, that he was fearful that his testimony would result in retaliation against him and his family. On cross-examination, Rivera reiterated his lack of recollection of the incident or of Just Right Cutz.

The state then recalled one of the investigating police officers, Martin Heanue. Heanue testified that he had

interviewed Rivera on two occasions in connection with the October, 2017 incident. He stated that the first interview was video and audio-recorded. The state offered the video into evidence, the court asked defense counsel if he had an objection, and defense counsel responded, "[n]o, Your Honor." The court then stated: "Alright. Under *State* v. *Whelan*, [supra, 200 Conn. 743], I think it's admissible," and the prosecutor confirmed that "[t]he state is offering it pursuant to . . . *Whelan*, Your Honor." The court reiterated, "*State* v. *Whelan*. I think it's admissible. There's no objection, I don't believe"; defense counsel stated that, "[u]nder that [ground], no, Your Honor." The court then stated that it would "not say anything more in that regard absent objection. It will be entered as a full exhibit in its entirety," and the prosecutor stated that, "[t]he record should reflect based upon agreements of counsel." The prosecutor confirmed the proper time stamp for which it was being offered, and defense counsel responded, "[t]hat's correct, Your Honor. That's what we had agreed to and we discussed in chambers." The court admitted the first interview into evidence, and the prosecutor played it for the jury.

Heanue then testified that there was a second recorded interview with Rivera. Heanue recognized the exhibit when it was shown to him, and the state offered it into evidence. The court asked defense counsel, "[u]nder *State* v. *Whelan*, anything?" The prosecutor confirmed that *Whelan* was the ground for the state's proffered admission, and defense counsel responded, "Your Honor, we did have discussions on this interview as well, given the proper pauses and stops and starts. No objection." The prosecutor confirmed the proper video excerpt, the court admitted the second interview into evidence, and it was played for the jury.[6]

---

[6] During his brief testimony, Rivera recognized himself in a screenshot from the surveillance video. The prosecutor then presented Rivera with the photographs of the defendant that Rivera had signed during Rivera's second

"A waived claim, as opposed to an unpreserved claim, does not satisfy the third prong of the *Golding* test because, in such circumstances, we simply cannot conclude that injustice [has been] done to either party . . . or that the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial . . . ." (Internal quotation marks omitted.) *State* v. *Culbreath*, 340 Conn. 167, 179, 263 A.3d 350 (2021). "To reach a contrary conclusion would result in an ambush of the trial court by permitting the defendant to raise a claim on appeal that his or her counsel expressly had abandoned in the trial court." *State* v. *Holness*, 289 Conn. 535, 543, 958 A.2d 754 (2008).

"It is well settled that a criminal defendant may waive rights guaranteed to him under the constitution. . . . The mechanism by which a right may be waived, however, varies according to the right at stake. . . . For certain fundamental rights, the defendant must personally make an informed waiver. . . . For other rights, however, waiver may be effected by action of counsel. . . . When a party consents to or expresses satisfaction with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal." (Internal quotation marks omitted.) *State* v. *Foster*, 293 Conn. 327, 337, 977 A.2d 199 (2009). A defendant, or his counsel, may abandon the defendant's constitutional right to confrontation, "either expressly or impliedly by . . . deliberate action." *State* v. *Smith*, 289 Conn.

---

police interview. Rivera testified that he recognized from the photographs a "skinny version of [the defendant] right there, I guess," and that "look[ed] like" the defendant. Rivera acknowledged that it "could be," and he guessed that it was, his handwriting and signature on the photographs. The prosecutor then presented Heanue with the photographs that Rivera had signed and dated during the second interview as identifying the defendant. Heanue recognized each of the photographs and confirmed that Rivera had signed each of them. The court admitted the photographs into evidence without objection by defense counsel. The defendant does not challenge the court's admission of these photographs.

598, 621, 960 A.2d 993 (2008); see also *State* v. *Culbreath*, supra, 340 Conn. 180 ("[t]he decision to admit or exclude evidence on constitutional, statutory, or evidentiary grounds is the type of tactical trial decision that 'appropriately may be waived by counsel acting alone . . . .' "); *State* v. *Olivero*, 219 Conn. App. 553, 583, 295 A.3d 946 (" 'defense counsel may waive a defendant's sixth amendment right to confrontation' "), cert. denied, 348 Conn. 910, 303 A.3d 10 (2023).

This state's appellate courts have held that defense counsel's indication that he or she had no objection to the admission of an exhibit at trial constituted a waiver of the defendant's confrontation rights and failed to satisfy *Golding*'s third prong.[7] See, e.g., *State* v. *Holness*, supra, 289 Conn. 542–43 (defense counsel waived confrontation clause claim by failing to object to admission of unavailable witness' police statement and agreeing to court's limiting instruction that evidence could not be used for substantive purposes); *State* v. *Sweet*, 214 Conn. App. 679, 696, 280 A.3d 1243 (defense counsel waived confrontation clause claim by noting that he had " 'no objection' " to admission into evidence of property report and witness' statement to police), cert. denied, 345 Conn. 920, 284 A.3d 983 (2022); *State* v. *Luna*, 208 Conn. App. 45, 69, 262 A.3d 942 (defense counsel waived confrontation clause claim by indicating he had " '[n]o objection' " to marking of death certifi-

---

[7] A defendant who waives his claim before the trial court is unable to demonstrate that "the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial . . . ." (Internal quotation marks omitted.) *State* v. *Fabricatore*, 281 Conn. 469, 482, 915 A.2d 872 (2007); see id. ("our . . . [conclusion] that unpreserved, waived claims fail under the third prong of *Golding* . . . is consistent with our decisions declining to review claims of induced error"). We accordingly do not address the merits of the defendant's claim or the other prongs of *Golding*. See, e.g., *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 70 and n.4, 967 A.2d 41 (2009) (analyzing *Golding*'s third prong because " 'unpreserved, waived claims, fail under the third prong of *Golding*' "); *State* v. *Fabricatore*, supra, 482 (same).

cate and informing court he had no other objections to document's admission into evidence), cert. denied, 340 Conn. 917, 266 A.3d 146 (2021); *State* v. *Castro*, 200 Conn. App. 450, 462, 238 A.3d 813 (defense counsel waived confrontation clause claim by indicating he had " 'absolutely no objection' " to admission of ballistics report or testimony about its contents), cert. denied, 335 Conn. 983, 242 A.3d 105 (2020). We employ plenary review to determine whether defense counsel had waived this claim before the trial court. See *State* v. *Connor*, 321 Conn. 350, 363, 138 A.3d 265 (2016).[8]

Our review of the record leads us to conclude that defense counsel affirmatively waived the defendant's confrontation clause claim, and, thus, his claim fails to satisfy *Golding*'s third prong. After Rivera denied any recollection of either his interviews with the police or the incident at issue, the prosecutor sought to introduce videos of the interviews into evidence through Heanue. The prosecutor and the trial court made clear that the evidentiary basis for the admission of both interviews was *Whelan*, which, like the confrontation clause, requires as a predicate to admission that Rivera be available for cross-examination. See *State* v. *Whelan*, supra, 200 Conn. 753; see also *Crawford* v. *Washington*, supra, 541 U.S. 68–69. The court, on its own initiative, further inquired of defense counsel whether he objected to the admission of the interviews into evidence under

---

[8] The defendant does not challenge whether defense counsel's waiver was knowing and intelligent. We nevertheless reiterate that, "[i]n our adversary system, the trial court was entitled to presume that defense counsel was familiar with *Crawford* and had acted competently . . . . To conclude otherwise would require the trial court to canvass defense counsel with respect to counsel's understanding of the relevant constitutional principles before accepting counsel's agreement on how to proceed." (Footnote omitted.) *State* v. *Holness*, supra, 289 Conn. 544; see also *State* v. *Bellamy*, 323 Conn. 400, 418, 147 A.3d 655 (2016). Nor does the defendant claim that the availability requirement means something different under *Whelan* than it does under the confrontation clause.

*Whelan*, asking, "[u]nder *State* v. *Whelan*, anything?" Rather than arguing that Rivera's lack of recollection rendered him functionally unavailable for cross-examination, defense counsel agreed to the admission of the videos into evidence, responding that, "[u]nder that [ground], no, Your Honor," and, "[n]o objection." The court, again on its own initiative, confirmed that defense counsel did not object, stating that it "will not say anything more in that regard absent objection." Defense counsel and the prosecutor then agreed on the proper time excerpts for each video that would be shown to the jury, and the videos were admitted into evidence without objection. Having failed to object to the admission of Rivera's interviews and having agreed that they were admissible under *Whelan* despite Rivera's purportedly functional unavailability, defense counsel waived this claim, and it therefore fails to satisfy *Golding*'s third prong.[9]

IV

The defendant's final claim is that Rivera's video-recorded interviews, admitted under *Whelan*, were insufficient in the absence of additional corroborative evidence to establish his specific intent to commit attempted robbery. He argues that Rivera's interviews were the only evidence to establish that the defendant

---

[9] The defendant in his reply brief claims that the trial court's admission of Rivera's interviews warrants reversal of the judgment under the plain error doctrine, which "is an extraordinary remedy, to correct injustices that are of monumental proportion . . . . [An appellate court] should find plain error only when the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Citation omitted; internal quotation marks omitted.) *State* v. *Henderson*, 348 Conn. 648, 662–63, 309 A.3d 1208 (2024). We decline to afford this extraordinary relief because it is not obvious that the trial court erroneously admitted Rivera's interviews into evidence or that their admission constituted a manifest injustice. See, e.g., *State* v. *Simpson*, 286 Conn. 634, 647 and n.16, 945 A.2d 449 (2008) (trial court did not commit plain error by admitting *Whelan* statement into evidence without reliability objection at trial).

had the specific intent to rob Rivera as the defendant approached the barbershop with his gun. The defendant asks that we overrule, limit, or find inapplicable our conclusion in *State* v. *Newsome*, 238 Conn. 588, 616, 618, 682 A.2d 972 (1996), that a reliable out-of-court statement may serve as the sole evidentiary basis for a conviction. We decline to modify our holding in *Newsome* and, instead, apply it in the present case to conclude that sufficient evidence established the defendant's specific intent to commit attempted robbery.

In *Newsome*, a witness provided a signed and sworn statement to the police one day after the crime at issue identifying the defendant as the shooter, but the witness later testified at trial that he had not been able to identify the shooter. Id., 591. The trial court admitted the witness' statement into evidence for substantive purposes under *Whelan*, and it served as the only identification evidence against the defendant. Id. On appeal, the defendant urged us to adopt a per se rule that a witness' statement admitted substantively under *Whelan* constituting the sole evidence identifying the defendant is insufficient alone to support a conviction. Id., 603. We rejected the defendant's proposed per se rule on the basis of our survey of out-of-state cases and our recognition that the procedures we adopted under *Whelan* provided sufficient assurances of the trustworthiness of the prior statement. Id., 610–11. We concluded that the sufficiency of a lone statement to support a conviction must be determined on a case-by-case basis through the use of our ordinary two part sufficiency of the evidence review, while also considering the statement's reliability based on an examination of the statement itself and the totality of the other record evidence. See id., 610–11, 616.

Applying this standard, we held in *Newsome* that the witness' statement sufficed to support the defendant's murder conviction because the jury could have reason-

ably found the witness' prior statement credible. See id., 617–18. We also held that the jury reasonably could have determined that the defendant was the shooter based on the witness' statement because "[t]he statement possessed ample indicia of reliability"; id., 618; as it was sworn to and in writing, was provided one day after the shooting, contained great detail about the altercation leading up to the shooting as well as the shooting itself, was corroborated by other trial evidence, and the witness' fear of retaliation was an obvious motive for his recantation. Id., 618–19. In dissent, Justice Berdon, relying on out-of-state cases and secondary sources, agreed with the defendant that the witness' police statement did not suffice to support his murder conviction because it was the sole evidence identifying the defendant as the shooter. Id., 633–37 (*Berdon, J.,* dissenting).

Recognizing that this precedent stands in the way of his claim, the defendant asks us to overrule *Newsome* and to adopt the reasoning of Justice Berdon's dissent. The defendant's claim "necessarily implicates stare decisis, which counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it. . . . Appropriate reasons and logic include [w]hen a previous decision clearly creates injustice . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Adam P.,* 351 Conn. 213, 223, 330 A.3d 73 (2025). "Then, [t]he court must weigh [the] benefits of [stare decisis] against its burdens in deciding whether to overturn a precedent it thinks is unjust . . . ." (Citation omitted; internal quotation marks omitted.) Id.

We decline to overrule or modify *Newsome* because the defendant offers us no cogent reasons or inescapable logic to justify departing from our holding in that case. Instead, he relies on the same out-of-state cases a majority of this court rejected in *Newsome*. Cf. *State*

v. *Ray*, 290 Conn. 602, 614, 966 A.2d 148 (2009) (noting that court in prior decision had rejected same arguments defendant raised). Additionally, overruling *Newsome* would require that we also abandon our well established principles regarding claims of evidentiary insufficiency that require us to construe the evidence in the light most favorable to sustaining the verdict and to defer to the jury's credibility assessments. See, e.g., *State* v. *Ziolkowski*, supra, 351 Conn. 160; *State* v. *Patrick M.*, 344 Conn. 565, 576, 280 A.3d 461 (2022); *State* v. *Hart*, 198 Conn. 424, 427–28, 503 A.2d 588 (1986). We are convinced by the majority opinion in *Newsome* that the sufficiency of a lone statement to support a conviction must be determined on a case-by-case basis. *State* v. *Newsome*, supra, 238 Conn., 610–11, 616.

Applying *Newsome*, we conclude that sufficient evidence existed to establish that the defendant had the specific intent to commit a larceny against Rivera. See *State* v. *Flores*, 344 Conn. 713, 759, 281 A.3d 420 (2022) (outlining intent required for attempted first degree robbery, which " 'can be inferred from his or her verbal or physical conduct and the surrounding circumstances' "). Our sufficiency review requires that we presume that the jury made the credibility finding that Rivera had told the truth in his two video-recorded interviews with the police. The defendant contends that Rivera's interviews were flimsy and that the jury instead should have credited the defendant's testimony that he did not intend to rob Rivera; however, it is the exclusive province of the jury, not an appellate court, to make that credibility determination. See, e.g., *State* v. *Patrick M.*, supra, 344 Conn. 576; *State* v. *Newsome*, supra, 238 Conn. 617.

Much like the declarant's statements in *Newsome*, Rivera's statements to the police were reliable because they were recorded and given less than one day after the shooting. See *State* v. *Newsome*, supra, 238 Conn. 618. Rivera gave the police *two* interviews during which

he provided precise and consistent details about the altercation leading up to the shooting, and he confirmed his familiarity with the defendant. See id. In both interviews, Rivera consistently recounted that the defendant had attempted to snatch his chain, resulting in a physical altercation, and that the defendant returned to the barbershop and walked up to Rivera, pointed a gun at him and said he would "take everything else." Moreover, Rivera's trial testimony did not undermine the veracity of his account during the police interviews because what he mostly had said at trial was that he lacked any recollection six years after the crime, after which the prosecutor prompted him to admit that his reluctance to speak about the incident at trial was caused by a fear of retaliation. See *State* v. *Newsome*, supra, 618–19.

Finally, contrary to the defendant's claim, Rivera's video-recorded interviews did not constitute the only evidence the jury could have relied on to find that the defendant had the specific intent to attempt to rob Rivera. Rivera identified the defendant from the screenshots of the surveillance photographs with absolute certainty as the person who tried to rob him. Rivera's statements were corroborated by the surveillance videos that captured the defendant's approach of Rivera outside of the barbershop with his gun in hand, as well as his preceding actions preparing to rob Rivera. The context afforded by the video, which depicted the defendant's reenactment of his initial snatching of Rivera's chain, the preparation of the getaway car, and his approach and pursuit of Rivera into the barbershop are all facts from which the jury could have reasonably inferred that the defendant had the specific intent to attempt to rob Rivera. See, e.g., *State* v. *Haughwout*, 339 Conn. 747, 765–66, 262 A.3d 791 (2021) (jury reasonably could infer intent from video of incident and context of argument preceding incident). In short, it was reasonable for the jury to infer from the defendant's verbal

and physical conduct that he had the specific intent to commit attempted robbery. See, e.g., *State* v. *Flores*, supra, 344 Conn. 759. Under these circumstances, Rivera's statements admitted under *Whelan* were reliable, corroborated, and sufficient to support the jury's verdict.

The judgment is affirmed.

In this opinion the other justices concurred.